I'll dispense with the reading of the calendars. We do have five cases. Case number 22-1444 from Eastern Missouri, United States v. Louis Rupp. Mr. Kanzler, when you're ready. Thank you, Your Honor. May it please the court and counsel, Your Honors, I'm Jay Kanzler. I'm joined by my co-counsel, David Dimmett. I appear before you on behalf of Mr. Louis Rupp. Mr. Rupp appeals from the district court's denial of his motion to set aside the punitive damage award in this case and in the alternative to reduce the amount of the punitive damages awarded to the two minor children from $20,000 each to $2,500 each. On the first issue, that is the issue of whether the government presented sufficient evidence to permit the issue of punitive damages to go to the jury, I wish only to make two quick points because I believe the briefs on both sides cover this issue well. The fact that the district court granted summary judgment on the issue of liability is not dispositive of whether Mr. Rupp had actual knowledge that he was breaking the law. You can break the law, certainly, and not know or even intend to break the law. And there's no evidence in the record that Mr. Rupp had actual knowledge that what he was doing was in violation of the Fair Housing Act. Counsel, isn't reckless or callous indifference enough? It is, Your Honor. And I was just going to move to the next. You are absolutely right. The first issue is actual in the jury instruction, and then reckless disregard is the second one. And I would suggest to you that there's no evidence with reckless disregard for the law, but you are absolutely correct. Well, could it be the case that a reasonable jury could find that he buried his head in the sands? I mean, there's a lot of evidence that he was a voracious reader of the news, that he had been a landlord for many, many, many decades. And you don't necessarily need actual knowledge, as you mentioned. It's enough if you bury your head in the sand and don't look and see what your obligations as a landlord are. And I agree with you, Your Honor, that in other cases that this court has decided and that other courts from around the country. But I would suggest to you that on this issue of familial status under the Fair Housing Act. Other cases that this court has decided mostly dealt with race discrimination. And I'll venture to say that 99.9% of the country knows that doing anything on the basis of race, whether it be discrimination in employment, anything is illegal because it's been ingrained into our consciousness, into our society since the 1960s. On the other hand, with the Fair Housing Act as it relates to children in apartments or houses, that came about in the late 1980s. And I don't think that the number of folks that would know that is anywhere near as high. I would imagine it's a very low percentage. So to say that because someone is a landlord that they would know, I don't think there's enough evidence there, Your Honor. Does it make a difference though that he was a landlord for many decades? I could see the argument and I think it would be a strong one. I just became a landlord three months ago. I didn't know that. And I'm still learning the ropes. But when you've been a landlord for multiple residences for a course of decades, I think that argument gets weakened a bit. I respect your opinion. I would point out one last thing on that issue. That Mr. Rupp, what the record suggested is that Mr. Rupp was in this business. He had the properties and he basically took the lease that he had been using, that the prior owner of the properties had been using, and he started to use that lease on and on. And there was never another instance of a claim of discrimination based on familial status against Mr. Rupp. Oh, I'm sorry, Your Honor. Does it make a difference that he was still using the lease with the problematic language nine months after he first became aware that the familial discrimination, familial status discrimination was a problem? Yeah. I mean, isn't that something that you could infer as a juror that really this was all long intentional? I mean, the failure to act promptly once you become aware that there is a problem, isn't that some evidence creating at least a jury question? I understand your question and your point. And I would suggest that the testimony clarified that, that that was a mistake. Is that one of those very bad facts that, you know... Yeah, we all got bad facts in our cases, man. I was a trial lawyer for a while. I get that. I think how that was explained is that was a mistake, that in fact he had gone to the Homeowners Association and different things and taken positive steps, affirmative steps to not do that. And in fact, you know, he had that one lease. So while I believe that Mr. Rupp did not have knowledge and did not stick his head in the sand, I respect your positions and your questions. And I was going to move on to the second point, unless... Anyone else? Judge Kelly? Okay. So now in the alternative, if you were to find that this was a jury question and could have been submitted to the jury, I believe that in this case the jury award on punitive damages was unconstitutional as it related to the two minor children. As you know, the compensatory and $3,000 for the adults and then $10,000 each in punitives. And then when it came to the two minor children, it was $1,000 in compensatory damages and $20,000 each in punitive damages. And as we look at the factors that this Court is guided by under the Brown-Williamson case, we have degree of reprehensibility, disparity between the actual potential harm suffered in the punitive damage award, often known as the ratio, and then finally the difference between the punitive damage award and the civil monetary penalties or other fines that could have been imposed in this particular case. And while these factors are guideposts, I think they're still very relevant. This case would be far more crucial, critical, even sexy if we were talking $20 million instead of $20,000. But the same token, it is important in that this case, your decision, the law remains the same and future cases, future parties are going to look at a decision like this and say, okay, how does that apply in the $20 million case, even though what we're looking at is $20,000 here. And I don't think it's important at all to say that Mr. Rupp was a very wealthy man because he had worked very hard and that it was only 1.5% of his net worth. But counsel, what if you look at what Mr. Rupp was charged with doing was kind of a family, collectively. And interestingly, the damages were divided up among the four family members. But when you're talking about one act, essentially, that that affected four people, do we look at it differently? You've asked us to sort of compartmentalize each one of these awards, but it's a little bit different than the cases where you have multiple acts for which a jury finds punitive damages or might find punitive damages on one act, but not another. Can you help walk me through your analysis there and why you think it's so important to focus in on the individual plaintiffs? So the government in this particular case made a conscious decision to submit on four verdict forms. And I will tell you that this was, in my opinion, because the parents were not sympathetic parties in this case. In fact, the jury came back with a question in the transcript saying, how do we keep the money away from the parents and just to the kids? So what we have is a decision to submit four separate, in essence, you talk about causes of action. A cause of action, you know, conduct against child one, conduct against child two, conduct against parent one, conduct against parent two. If we had submitted as the government against Lewis Rupp, and then here are the damages, then we could say, okay, and we could make, we could aggregate these. We have the same conduct, as you will. This is a lease and a letter that said, we're not renewing your lease because of your familial status. So it's the same conduct. And yet, what the jury did was, they awarded $10,000 in punitive damage for the parents each on that same conduct, but then said it's $20,000 for the same conduct against the children. And I think that demonstrates passion and prejudice. Do you think that the jury, did you object to that? Was it your preference to have just one punitive damages question presented to the jury, such that it was, what were the punitive damages as to this family based on the defendant's conduct? So you're right, I did not try the case below, but I believe the answer to your question is no, the defendant did not object to the submission of the jury verdict form. But that being said, the government did choose to that. It was their form. And therefore, I think it's proper for this court to analyze for each of them individually. And so, when it comes to the parents, the 1 to 1 or 3 to 1 ratio makes sense. But when it comes to the children, a 20 to 1 ratio does not make sense. Now, let's look at it, what if we had gone all in one? Are you aware of a case where this analysis has actually been done? I was a district judge for a long time. And ordinarily, when we got to this analysis, we were looking at what's the total amount of the verdict that's been delivered. And if you think about this particular verdict form, not unusual. You can look at intentional tort cases where there's loss of consortium claim, then separates that. You separate that out on the jury form damages for that claim as opposed to the main claim for the person who's injured. And when we always got to punitive damages, I don't recall this argument ever having been advanced. So, are you aware of a case where this argument has been advanced by others and accepted by a court? Under the Fair Housing Act, no, Your Honor. And why this case, I think, takes on a little more importance than maybe, even though it's $20,000 in punitive damages, is that there aren't that many. There just aren't that many Fair Housing Act cases. So, we're out there scrambling saying, well, the facts over here apply over here and not. The only case that I was really within this circuit was the Union Planters case that I cited in my reply brief. And again, that was a case where the court looked at two different submissions on conversion and trespass, I believe, and said, listen, when we have submitted this on two different forms, it is appropriate to look at the two distinct punitive damage awards and not aggregate them. That's the closest I can come, Your Honor. Thank you. I think it's also important, and I was going to go back to your question, Judge, even if we did go ahead and, and does this mean two minutes until my ten minutes? Two minutes. You're in your rebuttal. Oh, I'll go ahead and just, the last thing I'd like to say is on this before I sit down, that if we do aggregate them, then if we look at what the civil monetary penalties would be in this case of $19,700, again, it should be reduced down. The government has decided in these cases that, that the appropriate deterrent is that amount. You know, the $200 speeding ticket applies to Elon Musk and to me. And there's nothing to say that the $200 or the $19,700 on a first offense is not the appropriate maximum deterrent. Remember, those penalties are not the minimum, they're the maximum. In this case, it's $60,000 if we were to aggregate them. And once again, I think that is in excess of what the landlord, this was an apartment that had $10,000 annually in rent, $750 a month. That's two years of what should be expected in this case. I think the $60,000 is excessive. And I'll reserve the remainder of my time. Thank you. Ms. Lamar, when you're ready. Thank you. Good morning, Your Honors, and may it please the Court. Janae Lamar for the United States. The jury in this case considered the evidence and made two reasonable conclusions. First, they determined that Mr. Rupp was liable for punitive damages because when he evicted this family just weeks after they brought home their new baby, he did so in the face of a perceived risk that doing so would violate federal law. Second, the jury determined that this reprehensible conduct warranted a $60,000 award, which is in line with civil penalties and bears a reasonable relationship to the compensatory award in this case. Both of these conclusions are supported by the record and this Court should affirm. I'd like to turn first to question one, specifically some of the issues that this Court discussed with opposing counsel. The evidence was not just Mr. Rupp's experience. It was not just that he had been a landlord for 50 years. And that evidence has been considered in other cases as sufficient to submit the issue of punitive damages and as supporting the finding for liability for punitive damages. But it wasn't just that. It was also that Mr. Rupp was aware of discrimination laws, both at the state level and the federal level. He was aware of almost all of the protected classes that are protected by the Fair Housing Act. Conveniently, he says that he didn't know about familial status discrimination, but he knew about race, he knew about gender, he knew about sex, he knew about gender identity. He also knew about disability, which was added to the Fair Housing Act at the same time that the familial status prohibition was added. And so a jury could look at that, his knowledge of discrimination, and say, you say you know about discrimination laws. This is your business. We believe that you also knew about this. There's also evidence, not just that Mr. Rupp was an experienced landlord, but about how he ran his business. He testified that he made a practice of following the law, of learning the law. He understood that laws change over time, and that he kept up to date with them. And so while the general public may not know about the familial status obligations and discrimination laws in this context, it was reasonable for a landlord to know, where he testified that he's an expert in his business. He knows the laws, he knows what governs them, and he knows when laws change and he has to change his practices. He testified that he knew what inspections had to happen. He knew when new things had to be installed in his buildings. For example, he knew when the law changed and he had to add in carbon monoxide, I believe, monitors in an apartment building. The general public may not know that, but someone who testifies that they are an expert in how they run their business, who knows how to be a landlord, and who has been doing this for decades, does know that. And so it's not just the experience, it's also his practice over these decades of time. Speaking to, I believe, Your Honors raised the issue of this lease that was found nearly a year after this incident with the Irwin-Teals, that does also support the conclusion that he knew. This lease, this signed lease, which had the language, no children, is the only evidence of a signed lease that Mr. Rupp used after this to listen to. And he did not present a single signed lease that he had executed after this case without the term in it. Instead, he presented some blank leases that had not been executed. But the jury could look at this and say, we've seen a lease that you signed with a new party nine months later. We've heard your testimony about how you know what you're doing, about how you make sure to follow the law in all other contexts, how you know how to do things when it is to your benefit. We think that you knew this as well. We think that you evicted this family knowing that doing so may violate federal law. What Mr. Rupp asks on this question is for this court to reject the jury's verdict because they didn't believe him. And that's simply not the standard. First, as the defendant cited in one of its cases, the defense cites, this is Ogden, this court has made clear that any conflicts of evidence, any reasonable inferences, any all benefit of the doubt of the evidence must be decided in favor of the non-movement, in this case, in favor of the verdict. And so the idea that we should just believe Mr. Rupp because he said this is contrary to the standard of review at this stage. Additionally, this court has found that, and courts have found consistently, that juries are not required to believe any witness or piece of evidence. As this court found in B&B Hardware, a jury is entitled to disbelieve or believe any piece of evidence, even when it's uncontradicted or it's unimpeached. And in this instance, Mr. Rupp was significantly impeached. As the district court found, there were a number of reasons for the jury to not believe Mr. Rupp when he said he had no idea, he didn't know that this was a federal law, he had no idea that he might be violating federal law. Just a few examples of his impeachment. Mr. Rupp testified that he didn't actually evict this family because they had a second child. This is contrary to the court's decision as a matter of law that that's what happened. This is contrary to his eviction letter, which said, this is why I'm doing this, because you have this child. It's contrary to testimony that he made during trial and other statements that he had made, as well as testimony of other people. He also testified that, or the jury heard him testify, that Laura lied and tried to hide the existence of this child by saying she had a miscarriage. And so he took the stand and he said, not only did they have this kid, but she lied to me. She tried to hide the fact that she had this kid and that the kid actually died via miscarriage. But the jury heard from Laura. They heard that she had had a miscarriage before. She would never use that lightly. She would never lie about something like that. And she was incredibly grateful to have this child. And so throughout this case, there was significant to see how he presented himself, to see how he changed his story and was inconsistent. And for all these reasons, a jury could reasonably not believe his testimony. And the United States thinks that based not just on these credibility issues that the district court has identified, but also on the affirmative evidence introduced about his experience, about his practice in running his business, about his knowledge of discrimination laws, there was sufficient evidence to support a finding of punitive damages liability. Turning to the second question of constitutionality, I want to just point out two quick things before turning to the guideposts that were discussed previously with opposing counsel. First off, as this court has found, there is, in D&B Olibus, there is a strong presumption in favor of a punitive damages award when it is a result of fair procedures. Fair procedures being the jury was selected impartially, the jury instructions were correct, things along this line. Mr. Rupp does not challenge the fairness of this trial. He doesn't say there was any improper issues in choosing the jury. He doesn't say the jury instructions were incorrect. He doesn't say that there was any fairness or due process problem in the course of this trial. And given that, and given this court's precedent in Dean, there is a high presumption that he has to overcome to show that this award was unconstitutional. More importantly, when the courts are considering the constitutionality of punitive damages awards, they are looking at whether or not there is fair notice, and they are concerned about whether or not a punitive damages award is grossly excessive such that it shocks the conscience. When applying the standard, the court has affirmed awards of hundreds of thousands of dollars and millions of dollars. In this case, there is a punitive damages award of $60,000 after a blatant disregard for the Fair Housing Act affecting a very vulnerable family. That $60,000 award is nowhere nearly as high to be grossly excessive to shock the conscience. Turning to the guidepost, Your Honor, speaking first to reprehensibility, this conduct easily satisfies the reprehensibility guidepost. Not only do we have the first one of the factors conceded by the defendant, Mr. Rupp, he admits that the family was financially vulnerable. But we don't just have that. Every other of the four factors that the courts look to when considering reprehensibility is satisfied. This wasn't just about economic harm. This wasn't just about money that was lost. This family was physically and emotionally harmed. Ms. Irwin, Laura, this is happening just weeks after she's given birth through a really traumatic birth experience where both the baby's life was at risk. She had an emergency C-section. She testified that she could barely walk. She couldn't climb the stairs well. She was in a lot of pain. She had reopened her surgical incision. She was very weak. She's in an extremely vulnerable state. But because of Mr. Rupp's conduct, not only did she have to look for a new home, not only did she have to end up caring for her child by herself because her husband wasn't allowed to be there during the nights, she also had to go back to work weeks before she planned to and months before she had healed. And so this woman has suffered physical harm. Additionally, there was testimony to support that each of the members of the family suffered emotional harm. This was an emotional time for them. They're excited to bring home a new baby. They've all lost a lot of sleep in bringing home this new baby. And right as they get there, two weeks after they get home from the hospital, they suddenly have to look for a new house because their landlord is evicting them for this. This is a strong factor. The evidence is very strong to support this factor's support of the reprehensibility guidepost. Additionally, Mr. Rupp was both indifferent to their health and safety. He knew that they didn't have anywhere else to go. He knew they had young children, including this newborn, and he still evicted them. He still refused to negotiate with them. When Mac begged him to not evict them or to at least give them time to raise money to find somewhere to go, he refused to even have a conversation. And so that evinces a reckless disregard of the family's health and safety. This is also not an isolated incident, and this was not a mere accident. Mr. Rupp has had this policy for decades. He testified that he has done this every time. His lease has always said this. His application has always said no when he has chosen to make an exception to that. He has always done so by enforcing lesser terms, by requiring that people sign leases on a trial basis. In this instance, he evicted this family, but he's been doing this for decades, as he admits. This isn't a mere accident. This isn't isolated conduct. Thus, all of the factors pointing towards reprehensibility are met. This is very strong, reprehensible conduct. Turning next to the consideration of the ratio. The ratio here involves a $60,000 punitive damages award and a $14,400 compensatory award. That award, when we look at the face of it, the ratio is 4 to 1. 4 to 1 is consistently almost presumptively constitutional. Courts have indicated that it fits within the single-digit ratio that courts typically look for. I believe that is more often to be acceptable. It also fits in with the common law, which has allowed for single and double and treble and quadruple awards. This is right dead center in things that are typically constitutional. To avoid this nearly unquestionably constitutional ratio, the defendant asks you to do what no other court has done. No other court has disaggregated a punitive damages award in the way that the defendant asks. In fact, in cases both cited by the United States and by the defendant, when presented with facts like this, when presented with facts where multiple people are harmed, courts aggregate the awards. This court in Big D Enterprise, when it was dealing with two families, one family was a couple, another family was a mother and her child, when they looked at the punitive damages awards, they didn't separate out what the child would get or what the mother would get. They didn't separate what one partner would get or what another partner would get. These people were harmed as a unit. They suffered as a violation that one experienced that the others did not. The courts aggregate those awards and consider the constitutionality of the punitive damage award in total. The Supreme Court has done the same. In State Farm, the victims in that case, there were, I believe, three families or four individuals. The court even notes in that case that they were going to split the money 90 to 10. Some people were going to get significantly more money than others. Nonetheless, the Supreme Court... In those cases, though, was there an instruction like was given here where the actual instruction to the jury was to divide up the people in the one unit for purposes of punitives? Your Honor, the record isn't clear in those cases what the instructions were, but that shouldn't govern this case or dictate the outcome of this case. How the awards are ultimately or practically distributed is a different question than whether or not the punishment is constitutional. When we're talking about the constitutionality of a punitive damage award, we're talking about whether or not this punishment is appropriate for the conduct that was done. As even opposing counsel mentioned, this is just one conduct. He did this conduct to this family in total. The fact that when you were separating out the money, some people might get more doesn't affect the constitutionality of the award. It makes sense that the children might get more. They were more vulnerable. This is a six-week-old and a six-year-old who were kicked out of their home. It makes sense that they are more vulnerable and thus are entitled to a higher punishment because it is a greater offense to kick out children from their home than to kick out adults who can go and somehow find another way to live. That makes sense and shouldn't govern this court's analysis. Would it have been more in line with your approach to have asked the jury to an overall punitive award and then divide it up rather than what does each individual family member get? Do you see the conceptual difference between the two? Your Honor, I do see the conceptual difference, but I don't think it has any legal significance. I don't think it makes any difference to this analysis. While there's no indication in these other cases what the instructions were, we don't know that the instructions were any different than the one here. Just a final point before my time runs out. Even if we are to disaggregate, this court and others have found that higher ratios are sometimes allowed and sometimes, even maybe inherently so, in cases like the Fair Housing Act, where there are low economic damages, where there are non-economic harms that can't be quantified, when it's hard to figure out what the compensatory award is, the ratio may need to be higher. For example, in the Lincoln v. Case in the Fifth Circuit, they have talked about how this is inherent to the Fair Housing Act and this makes sense. For all these reasons and the reasons stated in our brief, the United States asks that this court affirms the district court's ruling. Thank you, Your Honors. When you're ready, Mr. Kansel. Thank you, Your Honors. I do believe it is inconsistent, maybe even disingenuous to say, as the government has said, well, we want to separate out these damage awards because we know that the jury will be influenced by the numbers for individual awards to the children. But when we get to the Court of Appeals, we will argue that it should be in the aggregate. There's a reason they did it. They should be held to that. And again, the union planter's case, while absolutely not on point, is probably worth taking a look at. I have not come to the court asking you to step out on a big limb here legally. And as we have cited in the briefs, when it comes to the Fair Housing Act, the cases like the Quigley case, where this court has reduced the fair housing ratio, and the Schwast case, which comes out of Michigan, but again, talks about that and $400,000 to $300,000. But I would ask the court to really look at those cases that it has addressed in the Dawson case and the Page case, where they really looked at the civil monetary penalties. And in this case, when we look at that and we get to that aggregate again, those are supposed to be maximums, $19,700. If we're going to aggregate, that should be the had said, what is the total punitives? If you fine for punitives, what's the total amount? Next step, how do you divide that total amount among the family members? If we were faced with that jury verdict, would you have the same argument? No, Your Honor. I believe we would have an aggregate. We would be looking at that. I would have the same argument that the court, if they awarded $60,000 when the civil monetary penalty would have been $19,700, I would be arguing to you that three times what the CMPs were is unconstitutional, because it's well beyond what a landlord would expect. So yes, I would be arguing that, but in the context of the CMP, not the ratio. Does that make sense, Your Honor? It does. Thank you. And for all those reasons, we would ask that the punitive damage award be set aside, or in the alternative, that it be reduced consistent with constitutional guidelines to $2,500 per individual child. Thank you, Your Honors. We'll go ahead and take the matter under advisement. Thank you for your time and briefing here. The argument's been most helpful. The clerk will call the next case.